**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER TIERNAN, MAYNARD LANTIMO, and WILLIAM HEATON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEDISYS HEALTH NETWORK, INC., THE BOARD OF TRUSTEES FOR MEDISYS HEALTH NETWORK, INC. and JOHN DOES 1-10,<br><br>Defendants. | **CIVIL ACTION NO.**:<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs, Christopher Tiernan, Maynard Lantimo, and William Heaton ("Plaintiffs"), by and through their attorneys, on behalf of the MediSys Health Network, Inc. 403(b) Plan (the "Plan")[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciary, MediSys Health Network, Inc. ("MediSys" or the "Company"), the Board of

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Trustees of MediSys Health Network, Inc. (the "Board"), (collectively, the Company and the Board, are referred to as the "Defendants") for breaches of their fiduciary duties.

2. The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enable eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2025 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan established effective January 1, 2003, as restated October 1, 2023. The Plan covers all employees of Medisys Health Network, Inc. (the "Company" or "Employer"). … The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

3. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 F.Appx. 24 (2nd Cir. 2016).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process" for selecting service providers.[2]

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

5. A fiduciary is obligated to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

6. At all times during the Class Period, the Plan had between two and five hundred million dollars in assets under management. At the start of the Class Period in 2020, the Plan had $298,282,235 in assets under management. *See* Schedule H, attached to 2020 Form 5500 for the Plan, at 2.

7. By 2025, the Plan had $440,798,093 in assets under management. *See* Schedule H, attached to 2025 Form 5500 for the Plan, at 2.

8. The Plan's assets under management makes it among the largest plans in the United States.

9. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 3,558 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2025, the Plan had 4,200 participants. *See* 2025 Form 5500 for the Plan, at 2.

10. The marketplace for retirement plan services is established and competitive. Accordingly, because of its large number of participants and asset size, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services from 2020 through at least 2025.

11. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter*

*alia*, (1) failing to control the Plan's recordkeeping and administration costs; and (2) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

12. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13. Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I) and violation of ERISA's prohibited transactions (Count II).

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15. This Court has personal jurisdiction over Defendants because the Plan is administered in this District meaning the Company transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

16. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because the Company does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

**Plaintiffs**

17. Plaintiff, Christopher Tiernan ("Tiernan"), resides in Lindenhurst, New York. During his employment, Plaintiff Tiernan participated in the Plan. Plaintiff Tiernan suffered injury to his Plan account by paying excessive RKA costs.

18. Plaintiff, Maynard Lantimo ("Lantimo"), resides in Valley Stream, New York. During his employment, Plaintiff Lantimo participated in the Plan. Plaintiff Lantimo suffered injury to his Plan account by paying excessive RKA costs.

19. Plaintiff, William Heaton ("Heaton"), resides in West Babylon, New York. During his employment, Plaintiff Heaton participated in the Plan. Plaintiff Heaton suffered injury to his Plan account by paying excessive RKA costs.

20. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

21. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

***Company Defendant***

22. MediSys Health Network, Inc. is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 8900 Van Wyck Ezpressway, Jamaica, New York.

*See* 2025 Form 5500 for the Plan, at 1. MediSys is a non-profit integrated healthcare delivery system based in Queens, New York, that provides comprehensive inpatient, outpatient, and behavioral health services to communities in Queens and South-East Brooklyn. *See* https://medisyshealth.org/about-us/ (last visited October 28, 2026).

23. The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Medisys, directly or by acting through its Board, had control over plan management and/or authority or control over management or disposition of plan assets.

***Board Defendants***

24. "The Board of Directors / Board of Trustees of Medisys Health Network, Inc. is responsible for oversight of the Plan." Auditor's Report, attached to 2025 Form 5500 for the Plan, at 7.

25. Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over plan management and/or authority or control over management or disposition of plan assets.

26. Members of the Board during the Class Period are collectively referred to herein (referred to herein as John Does 1-0) as the "Board Defendants."

## IV. CLASS ACTION ALLEGATIONS[3]

[3] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

27. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the MediSys Health Network, Inc. 403(b) Plan at any time between November 20, 2020 to the date of judgment (the "Class Period").[4]

28. The members of the Class are so numerous that joinder of all members is impractical. The 2025 Plan Form 5500 lists 4,200 "participants with account balances as of the end of the plan year." 2025 Form 5500 for the Plan, at 2.

29. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

30. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. The proper form of equitable and injunctive relief; and

---

[4] Plaintiff reserves their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

D. The proper measure of monetary relief.

31. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

32. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

33. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

### A. Plan

34. "The Plan is a defined contribution plan established effective January 1, 2003, as restated October 1, 2023. The Plan covers all employees of Medisys Health Network, Inc. (the "Company" or "Employer"). … The Plan is subject to the provisions of the Employee Retirement

Income Security Act of 1974, as amended ("ERISA")." Auditor's Report, attached to 2025 Form 5500 for the Plan, at 7.

35. "Employees are eligible to become participants and make deferral contributions to the Plan as soon as administratively possible after their hire dates." *Id.*

***Contributions***

36. "[P]articipants may contribute up to 100% of Compensation (subject to IRS limits) percent of pretax annual compensation, as defined in the plan document, up to the maximum limits of the Internal Revenue Code ("IRC")." *Id.*

37. "The Company may make a discretionary contribution equal to a uniform percentage, if any, to be determined each year by the Company's Board of Directors." *Id.*

## VI. DEFENDANTS BREACHED THEIR FIDUCIARY DUTY OF PRUDENCE AND COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS

### A. The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Breached Their Fiduciary Duties in Failing to Obtain Reasonable RKA Fees

#### 1. ERISA's Fee Disclosure Rule

38. In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[5]

[5] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

39. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

40. As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

41. For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

42. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

43. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

44. Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**2. Costs for Recordkeeping Services Vary Little Between Competing Providers for Plans with a Substantial Number of Participants**

45. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

46. There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g., demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g., phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g., hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g., newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g., preapproved document services, operational compliance support).

47. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

48. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

49. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

50. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[6] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[7]

---

[6] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[7] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC*

51. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number, and character of the services provided to that additional participant***.

52. Recordkeepers such as Newport Group, Inc. ("Newport"), among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

53. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 3. Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Plan Fiduciaries

54. A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a "Request for Proposals" ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

55. More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar

---

*Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

56. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[8]

57. Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

58. Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. As noted above, Plaintiffs do not have access to these meeting minutes.

59. In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

60. For purposes of this complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Form 5500s filed with the DOL, market surveys, and other authorities.

---

[8] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

61. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees that wasted the assets of the Plan and the assets of participants.

**4. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

**a. The Plan's Recordkeepers Offered Routine Services**

62. Throughout the Class Period, Newport was the Plan's recordkeeper.

63. Newport provided routine bundled and á la carte service categories described above. The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2025 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 12, 15, 37, 50, 60, and 64. Below is a description of the recordkeeping codes:

12. Claims processing

15. Recordkeeping and information management

37. Participant loan processing

50. Direct payment from the plan

60. Sub-transfer agency fees

64. Recordkeeping fees

*See* Instructions for the 2025 Schedule C (Form 5500), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2025-instructions.pdf, at 26-30.

64. Any fees associated with other ancillary á la carte services performed by Newport would be negligible because it is on a participant-by-participant basis instead of plan-wide.

**b. There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period**

65. As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

66. At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any nationally recognized recordkeeper capable of providing lower recordkeeping fees.

67. Here, based on the fact that the Plan paid the same exorbitant amounts in recordkeeping fees throughout the Class Period, even though the general trend in the market has seen a decrease in recordkeeping fees over the last decade, there is little to suggest that Defendants conducted a RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. Below are some of the top recordkeeping providers in the country that RFPs could have been sent to:

**2020 TOP PROVIDERS (RECORDKEEPERS)**[9]

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |

[9] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/.

| | | |
|---|---|---|
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

68. Newport is considered a major recordkeeper in the marketplace similar to the above top ten recordkeepers in the marketplace.

69. These recordkeepers, including Newport, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendants genuinely sought a competitive rate, the participants in the Plan would have benefited from a significant reduction in RKA costs.

**c. The Plan's Recordkeeping Fees were Excessive and Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

70. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

71. As demonstrated in the table below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since the start of the Class Period and up to at least 2024.

| Plan Year | Recordkeeper | Participants | Schedule C Codes | Total RKA Reported[10] | Revenue Sharing[11] | PP$ |
|---|---|---|---|---|---|---|
| 2020 | Newport | 3,558 | 12 15 37 50 60 64 | $472,927 | $736,050 | $339.79 |
| 2021 | Newport | 3,684 | 12 15 37 50 60 64 | $322,696 | $877,263 | $325.72 |
| 2022 | Newport | 3,872 | 12 15 37 50 60 64 | $251,065 | $704,300 | $246.74 |
| 2023 | Newport | 4,108 | 12 15 37 50 60 64 | $258,760 | $959,463 | $296.55 |
| 2024 | Newport | 4,182 | 12 15 37 50 60 64 | $312,337 | $1,152,417 | $350.25 |
| 2025 | Newport | 4,200 | 15 37 50 64 99 | $674,564 | $1,334,697 | $478.40 |

72. The above fees were excessive when benchmarked against similar plans.

73. Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Cost Per Participant[12] |
|---|---|---|---|---|---|---|
| Principal | Great Dane Llc Employee's Retirement Savings Plan | 2020 | $199,259,549 | 4,328 | 13 37 50 64 | $38 |
| Schwab | Invesco 401(k) Plan | 2020 | $1,358,503,753 | 4,844 | 15 50 64 | $27 |
| Fidelity | Retail Business Services LLC Retirement Savings Plan | 2020 | $681,738,480 | 6,429 | 37 50 64 65 71 | $32 |
| Schwab | Morningstar, Inc. 401(k) Plan | 2020 | $681,973,580 | 3,950 | 15 50 64 | $47 |
| **Newport** | **MediSys Plan** | **2020** | **$298,282,235** | **3,558** | **12 15 37 50 60 64** | **$340** |
| | | | | | | |
| Schwab | Invesco 401(k) Plan | 2021 | $1,875,127,059 | 5,064 | 15 50 64 | $32 |

[10] The amounts identified in this column are from the "direct compensation paid by the plan" identified in Schedule C of the Form 5500s.

[11] The amounts identified in this column are from Plaintiffs' counsel's calculation of revenue sharing from investments in the Plan.

[12] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | |
|---|---|---|---|---|---|---|
| Principal | Great Dane Llc Employee's Retirement Savings Plan | 2021 | $223,640,056 | 4,657 | 13 37 50 64 | $32 |
| Schwab | Morningstar, Inc. 401(k) Plan | 2021 | $798,489,422 | 3,950 | 15 50 64 | $47 |
| Fidelity | Stop & Shop Supermarket Retirement Savings Plan | 2021 | $935,648,024 | 4,023 | 37 50 64 65 71 | $39 |
| Fidelity | Retail Business Services LLC Retirement Savings Plan | 2021 | $719,648,025 | 4,756 | 37 50 64 65 71 | $29 |
| **Newport** | **MediSys Plan** | **2021** | **$343,653,013** | **3,684** | **12 15 37 50 60 64** | **$326** |
| | | | | | | |
| Vanguard | Thrift and Investment Plan of Norfolk Southern | 2022 | $1,333,045,845 | 6,592 | 15 26 37 50 51 52 68 | $35 |
| Alerus | Harlem Children's Zone Profit Sharing Plan | 2022 | $14,830,060 | 1,182 | 15 | $13 |
| Schwab | Invesco 401(k) Plan | 2022 | $1,572,030,977 | 5,127 | 15 50 64 | $32 |
| Fidelity | Retail Business Services LLC Retirement Savings Plan | 2022 | $591,000,459 | 4,614 | 37 50 64 65 71 | $25 |
| Principal | Great Dane Llc Employee's Retirement Savings Plan | 2022 | $186,874,512 | 5,157 | 13 37 50 64 | $31 |
| Schwab | Morningstar, Inc. 401(k) Plan | 2022 | $700,023,581 | 5,048 | 15 50 64 | $47 |
| Fidelity | Stop & Shop Supermarket Retirement Savings Plan | 2022 | $767,072,982 | 4,059 | 37 50 64 65 71 | $35 |
| **Newport** | **MediSys Plan** | **2022** | **$298,628,685** | **3,872** | **12 15 37 50 60 64** | **$247** |
| | | | | | | |
| Vanguard | Thrift and Investment Plan of Norfolk Southern | 2023 | $1,473,245,456 | 6,955 | 15 26 37 50 51 52 68 | $18 |
| Fidelity | Stop & Shop Supermarket Retirement Savings Plan | 2023 | $861,937,740 | 4,096 | 37 50 64 65 71 | $26 |
| Schwab | Invesco 401(k) Plan | 2023 | $1,779,983,048 | 5,034 | 15 50 64 | $31 |
| Fidelity | Retail Business Services LLC Retirement Savings Plan | 2023 | $679,692,351 | 4,634 | 37 50 64 65 71 | $21 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Schwab | Allianz Asset Management of America 401(k) Savings and Retirement Plan | 2023 | $1,887,323,169 | 5,018 | 15 50 64 | $23 |
| Principal | Great Dane Llc Employee's Retirement Savings Plan | 2023 | $224,328,789 | 5,563 | 13 37 50 64 | $35 |
| Schwab | Morningstar, Inc. 401(k) Plan | 2023 | $877,946,528 | 5,211 | 15 50 64 | $50 |
| **Newport** | **MediSys Plan** | **2023** | **$345,559,783** | **4,108** | **12 15 37 50 60 64** | **$297** |
| | | | | | | |
| Vanguard | Thrift and Investment Plan of Norfolk Southern | 2024 | $1,551,674,772 | 6,541 | 15 25 26 37 50 51 52 68 | $25 |
| Fidelity | Retail Business Services LLC Retirement Savings Plan | 2024 | $1,001,892,127 | 6,429 | 37 50 64 65 71 | $18 |
| Schwab | Morningstar, Inc. 401(k) Plan | 2024 | $1,023,207,731 | 5,188 | 15 50 64 | $46 |
| Principal | Great Dane Llc Employee's Retirement Savings Plan | 2024 | $125,228,352 | 5,234 | 13 37 50 64 | $41 |
| Schwab | Invesco 401(k) Plan | 2024 | $1,949,968,630 | 4,891 | 15 50 64 | $31 |
| Schwab | Allianz Asset Management of America 401(k) Savings and Retirement Plan | 2024 | $2,157,697,959 | 4,907 | 15 50 64 | $45 |
| Fidelity | Stop & Shop Supermarket Retirement Savings Plan | 2024 | $931,933,519 | 4,026 | 37 50 64 65 71 | $20 |
| **Newport** | **MediSys Plan** | **2024** | **$386,699,066** | **4,182** | **12 15 37 50 60 64** | **$350** |
| | | | | | | |
| Schwab | Invesco 401(k) Plan | 2025 | $2,165,281,244 | 4,777 | 15 50 64 | $29 |
| Vanguard | Thrift and Investment Plan of Norfolk Southern | 2025 | $1,707,088,640 | 6,499 | 15 25 37 52 | $17 |
| Schwab | Allianz Asset Management of America 401(k) Savings and Retirement Plan | 2025 | $2,449,507,103 | 4,747 | 15 50 64 | $45 |
| Schwab | Fisher Investments 401(k) Plan | 2025 | $1,563,382,870 | 5,379 | 15 26 50 64 | $20 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Schwab | Applied Industrial Technologies Inc. Retirement Savings Plan | 2025 | $935,908,846 | 5,309 | 15 50 64 | $41 |
| Schwab | The Marzetti Company 401(k) Plan | 2025 | $177,564,201 | 4,077 | 15 26 50 64 | $13 |
| Schwab | Black Hills Corporation 401(k) Retirement Savings Plan | 2025 | $933,735,584 | 3,665 | 16 26 50 64 | $28 |
| Voya | Dominion Energy Virginia 401(k) Plan for Union-Represented Employees | 2025 | $525,890,617 | 3,340 | 15 37 | $36 |
| StanCorp | GHD Inc. 401(k) Employees' Savings Plan | 2025 | $539,245,080 | 3,330 | 12 15 18 50 | $25 |
| Milliman | FirstBank 401(k) Retirement Plan for Residents of Puerto Rico | 2025 | $192,696,087 | 3,277 | 15 37 50 59 64 | $36 |
| Schwab | Park-Ohio Industries, Inc. 401(k) Plan | 2025 | $179,261,786 | 3,099 | 15 26 50 64 | $19 |
| Schwab | William Blair 401(k) and Profit Sharing Plan | 2025 | $1,372,662,943 | 2,736 | 15 50 64 | $24 |
| **Newport** | **MediSys Plan** | **2025** | **$440,798,093** | **4,200** | **15 37 50 64 99** | **$478** |

74. The above table demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees during the Class Period.

75. The Plan's $340 average per participant fee from 2020 to 2025 is more than ten times (10x) than the average fee of $31 per participant from 2020 to 2025 for the forty-two (42) plans listed above.

76. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2020 through 2025. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees during the Class Period.

77. The Plan should have been able to obtain per participant recordkeeping fees of no more than $31 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

78. Further, because Newport was a party-in-interest and received income from managing funds in the Plan, the Plan's fiduciaries should have taken these additional sources of income paid into consideration to reduce the excessive RKA fees paid to Newport.

79. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**

80. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

81. At all relevant times, the Company and the Board and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

82. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). The Prudence Defendants failed to prudently manage the Plan with respect to making sure Plan participants paid reasonable rates for RKA.

83. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Plan's RKA rates, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

84. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

85. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Prohibited Transactions**

86. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

87. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

88. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;"

(C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

89. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

90. Defendants' decision to agree to pay excessive fees to Newport as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

91. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting

from imprudent investment of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: November 20, 2026

Respectfully submitted,

*Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066

Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiffs and the Putative Class*